UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


ROBERT S. SALOMON and          )
FRIEDMAN, SUVALLE & SALOMON,   )
P.C.,                          )
                               )
              Plaintiffs,      )
                               )
                               )   CIVIL ACTION NO.
                               )   13-10378-DPW
         v.                    )
                               )
PHILADELPHIA INSURANCE         )
COMPANIES,                     )
                               )
              Defendant.       )


MEMORANDUM AND ORDER
January 23, 2014

The plaintiffs, the accounting firm Friedman, Suvalle &

Salomon, P.C., ("FSS") and one of its principals, Robert S.

Salomon, filed this declaratory judgment action seeking to

establish that their professional liability insurer, Philadelphia

Indemnity Insurance Company ("PIIC"),[1] was obligated to defend

and indemnify them in connection with a lawsuit filed by a client

of the firm.  The parties have filed cross-motions for summary

judgment.

_____

[1] The defendant is misnamed as the "Philadelphia Insurance
Companies" in the complaint.  For the sake of clarity, I will
refer to the defendant as the parties do in their briefs, as the
Philadelphia Indemnity Insurance Company ("PIIC").

-1-

PIIC argues that it properly denied coverage because the underlying claims against Salomon and FSS arose from Salomon's alleged violation of various securities laws, and therefore fall within the Policy's "Securities Practice Exclusion" and related exclusions.  Salomon and FSS contend that the conduct forming the basis for the underlying claims does not fall within any securities-related exclusion, and, moreover, that the claims are explicitly covered by an optional coverage enhancement purchased by FSS covering "personal financial planning."

## I.   BACKGROUND

### A.   *The Underlying Davidson Action*

At the crux of this dispute is a lawsuit against Robert Salomon and FSS by Harry Davidson, a former client of the firm. In his complaint, filed October 21, 2010 in Middlesex Superior Court, Davidson alleged that Salomon "made negligent misrepresentations and committed multiple violations of the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, in recommending that Davidson invest through an unregistered broker in unregistered securities issued by a fraudulent uniform procurement business that turned out to be a massive Ponzi scheme."  Davidson sought $750,000 in damages, which was the total amount he invested in the Ponzi scheme allegedly on the advice of Salomon.

-2-

### 1.   The Davidson Complaint

More specifically, the Davidson complaint alleged the following.  Davidson had been a client of Salomon and FSS for over a decade.  ¶¶ 1-2.  In connection with standard accounting services, Salomon also provided Davidson with investment advice and occasionally recommended specific investments.  ¶ 9. Davidson frequently followed Salomon's advice, and invested substantial assets based on his recommendations.  ¶ 10.

In or about February 2007, Salomon recommended an investment to Davidson that was brought to his attention by another longtime client of FSS, William Marcus.[2]  ¶ 12.  Salomon explained to Davidson, based on information from Marcus, that there was an opportunity to invest in a company owned by Richard Elkinson that supplied uniforms to municipalities and major athletic events. ¶ 14.  He represented to Davidson that the company had been operating successfully for about twenty years and that he could expect an annualized rate of return of approximately 10-12%.  *Id.* Salomon assured Davidson that, in view of Marcus's involvement and recommendation, he was comfortable with the integrity of Elkinson's business and was planning to personally invest in it. ¶ 16.

---

[2] Mr. Marcus was also named as a defendant in the Davidson complaint but is not a party to the instant action.

-3-

Based on Salomon's recommendation, Davidson agreed to invest in Elkinson's business.  ¶ 17.  In or about March 2007, at the direction of Marcus, as conveyed through Salomon, Davidson made out a check in the amount of $50,000 payable to Elkinson in exchange for promissory notes.  ¶ 18.  At the time Davidson made his investment, neither Salomon nor Marcus informed him that Marcus received commissions from Elkinson for securing investments in Elkinson promissory notes.[3]  ¶ 32.

The following year, in or about May 2008, Salomon contacted Davidson and advised him that he intended to invest additional amounts in Elkinson's business and recommended that Davidson do the same.  ¶ 20.  Acting on Salomon's recommendation, Davidson invested an additional $100,000 in Elkinson promissory notes.  In August 2008, Davidson invested yet another $100,000 in Elkinson promissory notes.

During 2009, due to increased media attention surrounding the notorious Bernard Madoff Ponzi scheme, Davidson became concerned about the legitimacy of the Elkinson investment.  ¶ 23. Davidson expressed his concerns to Salomon, who in turn conveyed them to Marcus.  ¶¶ 23-24.  Marcus advised Salomon that he would

---

[3] However it is not directly alleged in the Davidson complaint that Salomon knew Marcus was receiving commissions.  Nor is it alleged that Salomon received any commissions himself.

-4-

meet with Elkinson and review his business records to make sure everything was legitimate. ¶ 25. Soon after, Marcus informed Salomon, who in turn informed Davidson, that he had reviewed Elkinson's records and had concluded everything was legitimate. ¶ 26. Following this reassurance, Davidson made three more investments in Elkinson promissory notes, bringing his total principal investment to $750,000.[4] ¶¶ 27-28.

Unbeknownst to Davidson at the time he made the investments, Salomon's representations to Davidson were based on information from Marcus that was false and misleading. ¶ 29. Elkinson's business "was not in compliance with various basic regulatory laws, had been through a bankruptcy fifteen years earlier, had no contracts with any municipality or sporting event, and was in fact a Ponzi scheme in which the interest payments were funded not from any legitimate business activity, but from the funds of subsequent investors." ¶ 29. In April or May 2009, Elkinson began defaulting on investors' notes. ¶ 30. On January 5, 2010, Elkinson was arrested and charged in federal court with multiple counts of mail fraud. *Id.* The government alleged that Elkinson

---

[4] The Davidson complaint does not allege whether Davidson ever received any interest payments after first investing in Elkinson's business in March of 2007.

owed approximately $29 million to 130 investors.  *Id.*  Davidson lost his entire $750,000 principal investment.  *Id.* ¶ 31.

Davidson's complaint against Marcus, Salomon and FSS was asserted in thirteen counts, eight of which implicated Salomon and FSS.  Count I was a claim for negligent misrepresentation for the alleged failure to exercise reasonable care in "obtaining information about the Elkinson investment, and in communicating that information to Davidson."  ¶ 36.  Count II asserted a claim for breach of fiduciary duty for allegedly "failing to act with reasonable care in recommending the Elkinson investment" and "failing to disclose that Marcus received a commission from Elkinson for soliciting and delivering Davidson's investments."  ¶¶ 43-44.

Following Counts I and II, the complaint set forth a number of general allegations applicable to the remainder of the claims alleging various violations of the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, § 101 *et seq.*  ¶¶ 46-51.  The general allegations stated that "[t]he Elkinson notes were securities within the meaning of [Mass. Gen. Laws ch. 110A, § 401(k)]," that "Elkinson was an issuer within the meaning of [Mass. Gen. Laws ch. 110A, § 401(f)]," that Elkinson and Marcus "offered and sold" the notes to Davidson, that Marcus "acted as a broker-dealer or agent within the meaning of [Mass. Gen. Laws ch.

110A, §§ 401(b) & (c)]," and that Salomon and FSS "acted as agents [of Elkinson and Marcus] within the meaning of [Mass. Gen. Laws ch. 110A, § 401(b)]," and "offered and sold" the Elkinson notes to Davidson.

The complaint then alleged that Salomon and FSS committed violations of the Massachusetts Securities Act by operating as unregistered agents (Count VIII), offering and selling unregistered notes (Count IX), offering and selling notes by means of untrue statements or omissions of material fact (Count X), materially aiding Marcus's operation as an unregistered broker-dealer (Count XI), materially aiding Marcus's offering and selling of unregistered notes (Count XII), and materially aiding in Marcus's offering and selling of notes by means of untrue statements or omissions of material facts (Count XIII). ¶¶ 86-133.

## 2.  PIIC's Response to the Davidson Action

Prior to the filing of the Davidson complaint, counsel for Davidson sent a demand letter to Salomon and FSS dated February 12, 2010.  PIIC retained Attorney Robert Murphy to respond to the demand letter on behalf of Salomon and FSS.  PIIC subsequently provided Salomon and FSS with a reservation of rights dated April 28, 2010, informing them that it would not be able to determine its coverage obligations definitively until the Davidson

complaint was served.  Although Attorney Murphy continued to represent Salomon and FSS and answered the complaint on their behalf, on February 17, 2011, PIIC, through separate coverage counsel, denied and disclaimed any obligation to defend or indemnify Salomon or FSS.  In the letter denying coverage, PIIC took the position that it had no duty to defend or indemnify Salomon or FSS because the claims asserted in the Davidson action "are barred by Exclusion I(a) and (b), Exclusion J and the Securities Practice Exclusion" contained in the Policy.

    3.  <u>Settlement of the Davidson Action</u>

Following PIIC's disclaimer of any duty to defend or indemnify, Salomon and FSS opted to enter into a Confidential Settlement and Release Agreement on December 22, 2011.  In the settlement agreement, Salomon and FSS expressly disclaimed any liability or wrongdoing.  The settlement agreement also provided that although

> [t]he parties acknowledge that the Complaint contains claims alleging violations of the Massachusetts Securities laws . . . . , such claims do not form the basis for the consideration paid in connection with this Agreement . . . . [Rather,] the consideration paid in settlement of the Lawsuit is solely for the alleged liability for negligent misrepresentation and breach of fiduciary duty.

**B.  *The Policy***

The Accountants Professional Liability Insurance Policy issued by PIIC to FSS provides coverage for "CLAIMS made against

the INSUREDS by reason of a negligent act, error or omission in the performance of PROFESSIONAL SERVICES." The Policy further provides that PIIC "shall . . . have the right and duty to defend . . . in any INSURED'S name and on any INSURED'S behalf, any CLAIM for DAMAGES against any INSURED, even if such CLAIM is groundless, false or fraudulent." The Policy defines "CLAIM" as "a demand made upon any INSURED for DAMAGES, including, but not limited to, service or suit or institution of arbitration proceedings against any INSURED," and specifies that "[a]ll CLAIMS arising out of the same act, error or omission, or acts, errors or omissions which are logically or causally connected in any way shall be deemed as a single CLAIM."

The Policy includes within the definition of PROFESSIONAL SERVICES, "services performed or advice given by any INSURED to others for a fee or otherwise in the conduct of INSURED'S practice as an accountant." In addition, FSS purchased an optional "Pro-Pak Elite Coverage Enhancement," which, among other things, expands the definition of professional services to include "[c]onsulting in the course of the practice of accountancy," and "acting as a personal fiduciary." FSS also purchased an optional "Personal Financial Planner Extension," which further expands the definition of professional services to include "personal financial planning." The Extension does not

-9-

define "personal financial planning," but specifies that the definition "does not include services rendered as a security broker-dealer, nor does it include the direct sale of any investment."

The Policy also contains a number of exclusions, two of which are potentially relevant to this case.  Exclusion I(a) excludes from coverage any claim "arising out of" professional services performed for any client "to whom any INSURED promoted, solicited or sold securities, real estate or other investment." Exclusion J excludes from coverage any claim "arising out of "the sale or solicitation of securities . . . or any other investment by an INSURED."

Finally, an endorsement to the Policy sets forth the "Securities Practice Exclusion," which provides in relevant part that PIIC "will not defend or pay under this Policy for any CLAIM . . . arising out of an actual or alleged violation of . . . any State Blue Sky Laws; or any rules, regulations or amendments issued in relation to such acts," or for any claim "based upon common law principles of liability if made in connection with an actual or alleged violation of any law listed . . . above [e.g., State Blue Sky Laws]."

## C.  *Procedural Background*

Salomon and FSS originally filed this declaratory judgment complaint against PIIC in Massachusetts Superior Court on February 7, 2013.  The complaint asserts four counts, each arising out of the plaintiffs' coverage claims: Count I seeks a declaratory judgment as to the duty to defend; Count II seeks a declaratory judgment as to the duty to indemnify; Count III alleges breach of contract; and Count IV alleges breach of the implied covenant of good faith and fair dealing.  PIIC removed the case to this court pursuant to 28 U.S.C. § 1441(a).

## II.  STANDARD OF REVIEW

A movant is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the parties do not dispute the relevant facts.  This case turns exclusively on interpretation of the insurance policy, which is a question of law for the court. *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418, 425 (Mass. 2007).

## III.  DISCUSSION

## A.  *Legal Framework*

The parties agree that Massachusetts law applies to the instant dispute.  It is a well-settled principle of Massachusetts

law that "an insurer's duty is independent from, and broader than, its duty to indemnify." *A.W. Chesterton Co.* v. *Massachusetts Insurers Insolvency Fund*, 838 N.E.2d 1237, 1256 (Mass. 2005). "[T]he question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions." *Cont'l Cas. Co.* v. *Gilbane Bldg. Co.*, 461 N.E.2d 209, 212 (Mass. 1984). "An insurer has a duty to defend an insured when the allegations in a complaint are reasonably susceptible of an interpretation that states or roughly sketches a claim covered by the policy terms." *Billings* v. *Commerce Ins. Co.*, 936 N.E.2d 408, 414 (Mass. 2010). However, an insurer is not free to ignore "facts known or readily knowable by the insurer that may aid in its interpretation of the allegations in the complaint." *Id.* Of course, it is equally true that an insurer has "no duty to defend a claim that is specifically excluded from coverage." *Mt. Airy Ins. Co.* v. *Greenbaum*, 127 F.3d 15, 19 (1st Cir. 1997).

In recognition of the reality that lawsuits against insureds will frequently assert some claims that are covered by an insurance policy and others that are not, the rule "[i]n Massachusetts, as elsewhere, [is that] an insurer must defend the entire lawsuit if it has a duty to defend any of the underlying

counts in the complaint." *Liberty Mut. Ins. Co.* v. *Metropolitan Life Ins.*, 260 F.3d 54, 63 (1st Cir. 2001); *see also Aetna Cas. & Sur. Co.* v. *Cont'l Cas. Co.*, 604 N.E.2d 30, 32 n.1 (Mass. 1992). As a consequence, "the general rule under Massachusetts law is that if the insurer fails to defend the lawsuit, it is liable for all defense costs and (assuming policy coverage) the entire resulting judgment or settlement, unless liability can be allocated among covered and uncovered claims." *Liberty Mut. Ins. Co.*, 260 F.3d at 63 (citing *Liquor Liab. Joint Underwriting Ass'n of Mass.* v. *Hermitage Ins. Co.*, 644 N.E.2d 964, 968-69 (Mass. 1995)).

While "the insured bears the initial burden of proving that a claim falls within the grant of coverage, the insurer 'bears the burden of demonstrating that [an] exclusion applies.'" *Id.* (quoting *Great Southwest Fire Ins. Co.* v. *Hercules Building & Wrecking Co. Inc.*, 619 N.E.2d 353, 356 (Mass. App. 1993)). "Exclusions from coverage are to be strictly construed," and "[a]ny ambiguity in the somewhat complicated exclusions must be construed against the insurer." *Id.* (citing *Sterilite Corp.* v. *Cont'l Cas. Co.*, 458 N.E.2d 338, 342 n.10 (Mass. App. 1983)).

**B.  *Application to the Instant Policy***

The facts alleged are straightforward.  Salomon and FSS provided accounting services to Davidson for a number of years.

In conjunction with those services, Salomon occasionally made investment recommendations which Davidson typically followed. One such recommendation was to invest in the Elkinson business in exchange for promissory notes which Salomon represented would yield an annual return around 10-12% and which the complaint alleged to be securities under the Massachusetts Uniform Securities Act. Salomon indicated to Davidson that he was recommending the Elkinson investment based on the involvement of another client of his, Mr. Marcus, with the investment. Salomon indicated that he was planning on personally investing in the Elkinson business.

Although the complaint alleged that Salomon failed to disclose that Marcus received a commission from Elkinson for Salomon's investment, it did not directly allege that Salomon knew this, nor did it allege that Salomon received any type of compensation from either Elkinson or Marcus. Davidson made an initial investment in the Elkinson business, and following reassurances from Salomon (based on representations made by Marcus to Salomon) that the business was legitimate, invested additional monies. As a result of Salomon's negligence in recommending the investment without conducting any due diligence of his own, Davidson lost his entire principal investment when the Elkinson business turned out to be a Ponzi scheme. The

-14-

complaint further alleges that Marcus committed various violations of the Massachusetts Uniform Securities Act, and, based upon the facts alleged above, that Salomon "materially aided" Marcus and is therefore liable himself under the Act.

In defending its decision to deny coverage, PIIC principally contends that the claims in the Davidson complaint are clearly excluded under the Policy's "Securities Practice Exclusion," which excludes from coverage claims "arising out of an actual or *alleged* violation of . . . any State Blue Sky Laws," as well as any claims "based upon common law principles of liability if made in connection with an actual or *alleged* violation" of any Blue Sky law (emphasis supplied).  Salomon and FSS do not dispute that the Massachusetts Uniform Securities Act qualifies as a state Blue Sky law, or that Counts VII to XIII allege violations of the Act against Salomon and FSS.  Therefore, those specific counts are plainly excluded from coverage.

As to the counts alleging negligent misrepresentation (Count I) and breach of fiduciary duty (Count II), PIIC contends that they too are excluded as common law claims "made in connection" with an alleged violation of a state Blue Sky law.  In support of its argument, PIIC cites to *MIB Group, Inc*. v. *Fed. Ins. Co.*, 473 F. Supp. 2d 142 (D. Mass. 2006), where Judge Gorton interpreted a similar provision to exclude from coverage common law claims made

in connection with claims alleging violations of state securities laws, where "[a]ll of the counts, including breach of fiduciary duty and minority shareholder oppression, are necessarily related to or originate from the alleged misrepresentations and broken promises made to the principals of [the third-party complainant company] to induce them to invest in [the insured company]." *Id.* at 147.

PIIC next argues that Exclusion I(a) serves as independent grounds to exclude from coverage all claims made in the Davidson complaint because they arise from Salomon's "promotion" of the Elkinson investment.  PIIC variously defines "promote" as "to forward; to further; to encourage; to advance," Black's Law Dictionary 1214 (6th ed. 1990)[5], or "to assist or help move along a particular cause . . . to try to sell a particular cause," *see Commonwealth* v. *Stewart-Johnson*, 941 N.E.2d 656, 662 (Mass. App. 2011) (defining "promote" in the context of a criminal statute prohibiting the setting up or promoting of a lottery).  PIIC contends that Salomon's alleged conduct in recommending and facilitating Davidson's investment in the Elkinson notes clearly falls within their proffered definitions of "promote," and

---

[5] "Promote" does not appear in the current (9th) edition of Black's Law Dictionary.

therefore PIIC owes no duty to defend or indemnify Salomon or FSS.

Finally, PIIC argues that the claims in the Davidson complaint are excluded by Exclusion J because they "arise out of" Salomon's "solicitation for sale of securities . . . or any other investment." PIIC defines "solicitation as "[t]he act or an instance of requesting or seeking to obtain something." Black's Law Dictionary 1520 (9th ed. 2009). PIIC contends that just as Salomon encouraged Davidson to invest in the Elkinson notes and thereby "promoted" the investment under the terms of Exclusion I(a), he also "requested and sought to obtain the sale of the Elkinson notes," and thereby solicited the sale of an investment under the terms of Exclusion J. Ultimately, PIIC contends that under the Securities Practice Exclusion, Exclusion I(a) and Exclusion J, it possesses three independent bases to deny coverage and disclaim any duty to defend or indemnify Salomon and FSS.[6]

---

[6] Although PIIC cited Exclusion I(b), which excludes from coverage any claim "arising out of" professional services "for which any INSURED received a fee or commission prohibited by the Rules of Conduct of the American Institute of Certified Public Accountants," as a basis for denying coverage in its initial letter disclaiming any duty to defend or indemnify, it has not advanced that theory here. There is no allegation in the Davidson complaint that Salomon or FSS received any kind of fee or commission in conjunction with the Elkinson investment over and above the standard accountancy fee paid by Davidson.

Salomon and FSS respond principally by pointing to the
optional Personal Financial Planner Extension which FSS
purchased.  This extension expands the definition of
"professional services" under the policy to include "personal
financial planning."  As explained *supra*, the Extension does not
define "personal financial planning," but specifies that the
definition "does not include services rendered as a security
broker-dealer, [or] the direct sale of any investment."
According to the American Institute of Certified Public
Accountants, which is "the public accounting profession's
national organization" responsible for promulgating generally
accepted accounting standards,[7] *see*, *e.g.*, *United States* v.
*Arthur Young & Co.*, 465 U.S. 805, 811 n.6 (1984), "personal
financial planning" is defined generally as "designing financial
strategies . . . [,] implementing, monitoring, and updating a
financial plan," and specifically includes "[i]nvestment
planning."  AICPA, Statement on Responsibilities in Personal
Financial Planning Practice 4 (2010).  Salomon and FSS contend
that because the allegations in the Davidson complaint "center on
Salomon's purported recommendation of the Elkinson investment to

---

[7] Exclusion (I)(b) of the Policy, originally relied upon by PIIC
as one basis for denying coverage, *see* Note 6 *supra*, itself
contains a reference to AICPA standards.

his client Davidson," Davidson's claim falls within the expanded definition of "professional services" under the policy.

PIIC does not contest Salomon and FSS's proffered definition of "personal financial planning," nor would they have a basis to do so.  Because "[a]n insurance policy . . . is to be construed with reference to the customs of the trade or course of business respecting which it is issued," *City Fuel Corp.* v. *Nat'l Fire Ins. Co. of Hartford*, 846 N.E.2d 775, 776 (Mass. 2006), in the absence of a specific definition in the Policy, it is appropriate to employ the AICPA's definition.  With that definition in mind, it is clear that there exists some tension between on the one hand, the Policy's coverage of "investment planning," "designing financial strategies" and "implementing . . . a financial plan," and on the other hand, the cited exclusions for the "promot[ion]" or "solicitation" of an investment; at least insofar as promotion or solicitation can be defined to encompass the "encouraging" or "advancing" of a particular investment in which the insured is not alleged to have a pecuniary interest.

Salomon and FSS argue that Exclusions I(a) and J do not apply here because they are contained in "boilerplate" that is overridden by the optional Personal Financial Planner Extension to the extent the provisions are inconsistent.  Because the Personal Financial Planner Extension specifically states that it

does not cover "services rendered as a security-broker dealer . .
. [or] the direct sale of any investment," Salomon and FSS
contend that the Extension must be read to limit the scope of
Exclusions I(a) and J to services rendered as a broker-dealer or
the direct sale of an investment, neither of which are alleged
against Salomon or FSS in the Davidson complaint.  In support of
this argument, Salomon and FSS invoke the "cardinal principle of
contract interpretation [that] a more specific contract provision
controls a more general provision on the same issue," *Astra USA,
Inc.* v. *Bildman*, 914 N.E.2d 36, 55 (Mass. 2009), as well as the
insurance contract principles that "special provisions should
prevail over more general ones in case of ambiguity or
repugnancy," and "[r]isks specifically named in a coverage clause
are not excluded by a prior general exception in the policy."  2
Couch on Insurance § 22:2.  *See, e.g., Certain Interested
Underwriters at Lloyd's, London* v. *Stolberg*, 680 F.3d 61, 67 (1st
Cir. 2012); *Utica Mut. Ins. Co.* v. *Weathermark Invs., Inc.*, 292
F.3d 77, 83 (1st Cir. 2002).

     I do not view the language in the Personal Financial Planner
extension regarding acting as a "broker-dealer" and the "direct
sale" of securities necessarily to override Exclusions I(a) and
J.  While there is certainly some overlap between the provisions,
they are not entirely inconsistent, nor does the overlap render

the Personal Financial Planner Extension illusory.  Although significantly limited by the cited exclusions, the Personal Financial Planner extension still provides coverage for conduct that would not otherwise be covered under the Policy.

It is a well-established interpretive tenet that "[a]n insurance policy is to be read 'as a whole "without according undue emphasis to any particular part over another.'"  *Fireman's Fund Ins. Co.* v. *Special Olympics Intern., Inc.*, 346 F.3d 259, 261 (1st Cir. 2003) (quoting *Mission Ins. Co.* v. *U.S. Fire Ins. Co.*, 517 N.E.2d 463, 466 (Mass. 1988)); *see also Cochran* v. *Quest Software*, 328 F.3d 1, 7 (1st Cir. 2003) ("[C]ourts may not single out an isolated word or phrase at the expense of the language as a whole.").  Accordingly, "Massachusetts law dictates that [a court must] follow the plain language of the policy, even though some terms may be rendered redundant or superfluous in particular instances."  *See Stolberg,* 680 F.3d at 69 ("Where, as here, the effect of a narrow provision is starkly limited in light of a broader provision, [we are not required] to invent wholly separate purposes for overlapping provisions such that only one provision will govern in each case.").

While, in the absence of Exclusions I(a) and J, the Personal Financial Planner extension might be read to imply coverage for all investment planning that does not constitute acting as a

-21-

broker-dealer or the direct sale of securities, the Policy as a whole is not susceptible to such an interpretation.

More fundamentally, even if I were to conclude that the Personal Financial Planner extension partially overrides Exclusions I(a) and J, or I was persuaded that the factual allegations in the Davidson complaint do not clearly fall within Exclusions I(a) or J because Salomon did not promote, solicit or sell the Elkinson investment as such verbs are used in the investment business, there still exists the hurdle provided by the Securities Practice Exclusion.  Unlike Exclusions I(a) and J, the Securities Practice Exclusion is contained in an endorsement to the Policy, which, like the Personal Financial Planner extension, bears the language "[t]his endorsement modifies insurance provided under [the Policy]."  The Securities Practice Exclusion is thus not susceptible to the argument that the Personal Financial Planner extension, contained in a separate endorsement, was intended to supersede it.

The Securities Practice exclusion unequivocally bars coverage for claims alleging Blue Sky law violations as well as common law claims made "in connection with" claims alleging Blue Sky law violations.  There can be no doubt that, on its face, the Davidson complaint alleged both Blue Sky law violations and common law claims, namely, negligent misrepresentation and breach

of fiduciary duty, made in connection with and arising out of the same underlying facts as the alleged Blue Sky violations.  In that respect, this case is materially indistinguishable from *MIB Group.  See* 473 F. Supp. 2d at 146-47.  *See also Bendis* v. *Fed. Ins. Co.*, 958 F.2d 960, 963 (10th Cir. 1991).

I agree with Salomon and FSS that the gravamen of the factual allegations in the Davidson complaint – as it pertains to them – is that Salomon negligently recommended the Elkinson investment to him based on Marcus's misrepresentations.  Standing alone, these allegations would not necessarily bring the claim with any of the exclusions asserted by PIIC.  Critically, however, Davidson also alleged a number of violations of the Massachusetts Uniform Securities Act which rely on the same factual allegations as the common law claims.  I cannot agree with the contention of Salomon and FSS that "[s]imply because the Complaint later tries to tag-on Blue Sky violations to these business investments does not render the main two counts subject to the Securities Practice Exclusion."  Although I take no view on Davidson's likelihood of success on the Blue Sky counts had he pursued the case in court[8], their assertion underscores that the

---

[8] Similarly, I attach no significance to the underlying settlement agreement's self-serving language that the Blue Sky claims "do not form the basis for the consideration paid in connection with this Agreement."  Given the language of the Policy and its exclusions, such a contrived recitation is immaterial.

entire complaint falls squarely within the scope of the
Securities Practice Exclusion because the common law claims were
"made in connection with an . . . alleged violation of . . .
State Blue Sky Laws."  Given this exclusion in a policy which
provides that "[a]ll CLAIMS arising out of the same act, error or
omission, or acts, errors or omissions which are logically or
causally connected in any way shall be deemed as a single CLAIM,"
I conclude that PIIC has no duty to defend or indemnify.

### IV.  CONCLUSION

For the reasons set forth above, I GRANT PIIC's motion for
summary judgment (#18) and DENY Salomon and FSS's cross-motion
for summary judgment (#21).

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE